FILED IN CLERK'S OFFICE
U.S.D.C.   Atlanta

FEB 0 8 2012

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

TWT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. ROSE BETTS<br>and JENNIFER WILLIAMS,<br><br>    Plaintiff-Relators,<br><br>v.<br><br>TEXAS HOME HEALTH OF AMERICA,<br>L.P.; TEXAS HOME HEALTH SKILLED<br>SERVICES, L.P.; GUARDIAN HOSPICE<br>OF GEORGIA, LLC; GUARDIAN<br>HOSPICE, INC.; GUARDIAN HOME<br>CARE HOLDINGS, INC.;<br>ACCENTCARE, INC., OAK HILL<br>CAPITAL PARTNERS, L.P.; OAK<br>HILL CAPITAL MANAGEMENT, LLC;<br>JAMES ROGAN, M.D.; RANJAN PAUL,<br>M.D.; KINGSLEY AGBEYEGBE, M.D.;<br>and JOHN DOES, 1 through 10;<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 1-12-CV—0412<br>Jury Trial Demanded<br><br>FILED UNDER SEAL |

## COMPLAINT

The United States of America, by and through Relators Rose Betts and

Jennifer Williams, brings this action under 31 U.S.C. §§ 3729–3732 ("False Claims

Act") to recover all damages, penalties, and other remedies established by the

False Claims Act on behalf of the United States and Relators and would show the

following:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, as amended, 31 U.S.C. § 3729, *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a).

3.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

4.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## THE PARTIES

5.     Defendants Texas Home Health of America, L.P.; Texas Home Health Skilled Services, L.P.; Guardian Hospice of Georgia, LLC; and Guardian Hospice, Inc. (collectively "Guardian") are providers of hospice care. Guardian has single locations in Tennessee and Georgia, and three locations in Texas. Guardian's principal office is located at 1220 Hwy 327 E, Silsbee, Texas 77656. Guardian also has offices at 4360 Chamblee Dunwoody Rd., Suite 535, Atlanta, Georgia 30341-

1057 and 800 Crescent Centre Dr., Three Corporate Center, Suite 550, Franklin, Tennessee, 37067-4651.

6.      Upon information and belief, Guardian Home Care Holdings, Inc. was the owner and operator of Guardian through December 2010.

7.      AccentCare, Inc. (hereinafter "AccentCare") is a provider of hospice care, with locations in California, New York, Ohio, Washington, Arizona, Oregon, Colorado, Texas, Georgia, and Tennessee. AccentCare's principal office is located at 17855 North Dallas Pkwy, Dallas, Texas 75287.

8.      Defendant Oak Hill Capital Partners, L.P., an affiliate of a private equity firm known as Oak Hill Capital Partners, acquired and merged Guardian and AccentCare in or about December 2010 ("Guardian/AccentCare").

9.      Oak Hill Capital Management, LLC, a Delaware limited liability Company, is the legal entity through which Oak Hill conducts its activities.

10.     Dr. James Rogan, Dr. Kingsley Agbeyegbe, and Dr. Ranjan Paul are "medical directors" who have prescribed hospice care services for Guardian's patients at the Georgia hospice.

11.     John Does, 1 through 10 are "medical directors" who have prescribed hospice care services for Guardian's patients at the Tennessee and Texas hospices.

3

12.     Relator Jennifer Williams began working for Guardian in September 2010 as a case manager.

13.     Relator Rose Betts began working for Guardian in May 2011 as a case manager.

## MEDICARE AND MEDICAID PROGRAMS

14.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

15.     The Medicare program consists of several parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint. 42 U.S.C. § 1395(k), 1395(i), 1395(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42

U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

16.    In order to receive Medicare funds, enrolled suppliers, including Guardian, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

17.    Among the rules and regulations which enrolled suppliers, including Guardian, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over--utilization of services; (4) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

18.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. The Centers for Medicare and Medicaid Services ("CMS") administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

19.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

6

20.     42 C.F.R. §§ 455 *et seq.*, expressly states that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid.

21.     Guardian's Georgia hospice submits its claims for Medicare reimbursement through the fiscal intermediary Palmetto GBA.

22.     Guardian's Georgia hospice bills Medicare under its National Provider Identifier 1528294477.

## INTRODUCTION

23.     Guardian/AccentCare is a for-profit national chain of hospice providers. Guardian/AccentCare significantly funds its operations and employees through receipt of Medicare/Medicaid dollars on behalf of individuals who are supposed to be eligible to receive Medicare/Medicaid hospice benefits. To be eligible for hospice care paid by Medicare/Medicaid, an individual must be "terminally ill," meaning that that "the individual has a medical prognosis that his or her life expectancy is 6 months or less-if the illness runs its normal course." 42 C.F.R. § 418.3.

24.     While elderly patients may qualify for a variety of other medical services paid by Medicare/Medicaid, for-profit hospice companies like

Guardian/AccentCare are entitled to receive Medicare/Medicaid dollars only for Medicare/Medicaid recipients who are "terminally ill."

25. When a business such as Guardian/AccentCare admits a Medicare/Medicaid recipient to hospice care, that individual no longer receives, or is entitled to receive, services that would help to cure his or her illness. Instead the individual receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services. It is clear that Congress authorized funding from limited Medicare/Medicaid funds for this specialized benefit during the last several months of an individual's life.

26. Guardian/AccentCare, through its fraudulent business practices, admitted and retained individuals who were not eligible to receive Medicare/Medicaid hospice benefits and did so even after Guardian/AccentCare's auditors alerted it to troubling problems. Guardian/AccentCare misspent millions of Medicare/Medicaid dollars intended for recipients who have a prognosis of six months or less to live and need hospice care.

27. At all times relevant to this Complaint, Guardian and AccentCare were participating Medicare/Medicaid providers.

8

28.    At all times relevant to this Complaint, Medicare/Medicaid constituted and continues to constitute a significant source of revenue for Guardian and AccentCare.

29.    The Hospices submitted or caused to be submitted false claims for payment to Medicare/Medicaid for services and supplies.

30.    All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" or with reckless disregard, as those terms are defined in the False Claims Act, 31 U.S.C. § 3729 and related case law.

## HOSPICE CARE REGULATIONS

31.    In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. 42 C.F.R. § 418.20.

32.    "Terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3.

33.    Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

34.    The initial 90-day period must be certified by (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, certification requires only one of the aforementioned physicians. 42 C.F.R. § 418.22.

35.    The written certification requires (a) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (b) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (c) the signature(s) of the physician(s). *Id.;* Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

36.    Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302. To be covered, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

37.    It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

38.    Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

## FRAUDULENT SCHEMES

39.    From at least 2009, Guardian knowingly submitted or caused to be submitted false claims to Medicare/Medicaid and created false records and statements to receive reimbursement from Medicare/Medicaid for hospice care.

40.    Guardian falsely certified on electronic claim forms submitted to Medicare/Medicaid and admission and recertification documentation required to support the claims that hospice care provided to Medicare/Medicaid recipients was medically indicated and necessary for the health of the patient.

41.     Guardian created and/or submitted documentation that falsely represented that certain Medicare/Medicaid recipients were "terminally ill," meaning that the "individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." Many of the Medicare/Medicaid recipients were not eligible for hospice care paid for by the Medicare or Medicaid programs because they did not have a prognosis of six months or less to live if the illness runs its normal course.

42.     Sophisticated hospice providers such as Guardian and AccentCare are expected to fully know and appreciate the Medicare/Medicaid statutes, the definition of "terminally ill," and the local coverage determinations that set out medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live. The purpose of the Medicare/Medicaid requirements is to ensure that the limited Medicare/Medicaid funds are properly spent on services actually needed by Medicare/Medicaid beneficiaries.

43.     Guardian knew, deliberately ignored, or recklessly disregarded that the claims it submitted to Medicare/Medicaid falsely represented the medical condition and hospice eligibility of the beneficiaries. In addition, Guardian knew or recklessly disregarded that its business practices would lead to the submission

12

of false claims to Medicare/Medicaid for hospice services provided to ineligible beneficiaries.

**Admission and Recertification**

44.     Guardian regularly admits patients who do not medically qualify for hospice care and that it knows or should know do not medically qualify for hospice care.

45.     At Guardian, management makes all admission and recertification decisions, even though management never treats or sees the patients. At the Georgia office, this included William Maddox (Georgia Compliance/Quality registered nurse, quit in November 2011), Jewelene Griffin (Guardian's Georgia hospice's former Executive Director, promoted to Vice President of Hospice Services for Guardian/AccentCare), Cindy Norton (Deputy Chief of Staff or "DCOS"), Felichia Paulk (DCOS), and Claudine Taylor (replaced Griffin as Executive Director in August 2011).

46.     Guardian management regularly ignores the nurses' notes, patient records, and lab work, and instead fabricates information on the admission and recertification documents so that the medical director will admit or recertify ineligible patients.

13

47.     Guardian's medical directors in Georgia, formerly Dr. James Rogan and currently Dr. Kingsley Agbeyegbe and Dr. Ranjan Paul, rely on whatever Guardian management tells them when admitting or recertifying patients, without actually examining the patients.

48.     For admission and recertification of every hospice patient at Guardian, a medical director has signed a certification of terminal illness, stating "I certify that the above named patient is terminally ill with a life expectancy of six months or less if the terminal illness runs its normal course."

49.     Physician Recertification Statements require a hospice physician, hospice medical director, or nurse practitioner to sign a certification that "I confirm that I had a face-to-face encounter with the above named patient to gather clinical findings to determine continuing eligibility for hospice care."

50.     Both Relators have warned Dr. Agbeyegbe that the documents and information are fabricated, but he continues to admit and recertify patients based on the information given to him.

51.     Guardian holds weekly Interdisciplinary Group/Interdisciplinary Team ("IDG/IDT") meetings to discuss the patients' health, plans of care, and eligibility of the patients.

52.     From their experience in the industry, Relators know that at most hospices IDT summaries are written by the case managers who work with the individual patients. At Guardian, however, case managers are not allowed to write the IDT summaries, and they are instead written by management, who often fabricates whatever information is needed to make the patients eligible for hospice care.

53.     This results in discrepancies between the nurses' notes, which document the actual condition of the patients by nurses who have treated them, and the IDT summaries and recertification documents, which are written by managers who have never seen the patients and need only make statements that will support recertification.

54.     A number of Guardian's patients did not show a decline in health (particularly those who should not have been admitted), making them ineligible for recertification for hospice care, but Guardian kept them on hospice care and continued to bill Medicare.

55.     Because the patients are not in decline and the managers do not track the patients' progress, or even their "fabricated progress", even the IDT summaries and recertification documents themselves do not show decline, but rather simply state the minimum requirements for admission to hospice care. *Thus even the*

*documentation fabricated to support recertification does not actually support recertification.*

56.    William Maddox, Cindy Norton, Felichia Paulk, and Jewelene Griffin all have made false statements on IDT summaries that were contrary to the nurses' reports.

57.    When Relators raised the issue of discharging non-eligible patients at IDT meetings, Norton would often say that the hospice could not discharge the patient because Guardian needed to keep its "census" high.

58.    When Jennifer Williams questioned this unusual process of recertification, she was told to mind her own business because that's the way Guardian does things.

## Debility and Adult Failure to Thrive

59.    Under normal circumstances, potential patients are referred to hospice care with a particular diagnosis, and it is the hospice's responsibility to evaluate the severity of the patient's condition to determine if they meet Medicare's requirements for reimbursement for hospice care.

60.    Guardian, however, often develops its own diagnosis that will allow it to admit the patient and bill Medicare/Medicaid for hospice care.

61.     As a result, an unusually high number of patients are admitted to hospice care by Guardian with a diagnosis of Adult Failure to Thrive ("AFTT") or debility.

62.     Debility is a non-specific terminal illness that requires evidence of a limited life expectancy of six months, should show rapid decline after admission, and should convert to a more specific diagnosis within one month of admission.

63.     Patients properly diagnosed with debility are in such rapid decline that they rarely survive for more than a few weeks.

64.     Numerous patients diagnosed with debility by Guardian have received well over a year of hospice care without any decline in health.

65.     Patient MN was admitted to Guardian on July 31, 2010 with a diagnosis of AFTT. Patient MN met none of the requirements for hospice care: the patient was able to take care of herself, was ambulatory, had no signs of shortness of breath, and her son left her alone in their apartment for days on end because he was confident that she could care for herself.

66.     Evidence of an AFTT diagnosis is a serum albumin level of less than 2.5 gm/dl, which must be obtained prior to recertification.

67.     When Patient MN was admitted, her serum albumin level was 3.6 gm/dl. This level *increased* during her time receiving hospice care.

68.     On many occasions, Patient MN stated to her hospice nurse, Jennifer Williams, that it was nice to have her stop by and check on her, but that she was capable of taking care of herself.

69.     Guardian billed Medicare for Patient MN until March 27, 2011.

70.     Even though Guardian should have diagnosed Patient MN with a more specific illness after her first month, her diagnosis of debility was never changed during her time receiving hospice care from Guardian.

71.     Patient MH has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since June 24, 2010.

72.     Patient MH first came to Guardian with a diagnosis of cellulitis and hypertension and no doctor's referral for hospice, but rather was "referred" by a family member seeking assistance for Patient MH.

73.     During the entire period she has received hospice care from Guardian, Patient MH has been ambulatory, alert, and oriented, and should not have been eligible for hospice care.

74.     On January 10, 2012, Guardian submitted a claim to Medicare Part A for $7,027.00 for hospice care given to Patient MH (Patient Control No. GHA545935) from September 1, 2011 through September 30, 2011.

75.    On January 22, 2012, Wilma Falcon (Hospice Clinical Specialist) emailed Claudine Taylor and Jewelene Griffin that "the documentation by the physician, NP [nurse practitioner], and nurse are not showing eligibility" for hospice care for Patient MH for September 2011, and to "obtain additional supportive documentation".

76.    Patient MK has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since August 14, 2010.

77.    Patient MK has not shown any measurable decline in health – physical or mental – during the period she has received hospice care from Guardian and should not have been eligible for hospice care.

78.    To be eligible for hospice care for debility, a patient must have a Palliative Performance Scale ("PPS") score of 40% or less.

79.    Patient MS has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since January 22, 2011.

80.    Patient MS was admitted with a PPS of 50%, and remains ambulatory, alert, and oriented, and should not have been eligible for hospice care.

81.    Patient MW received hospice care from Guardian, billed to Medicare, for a diagnosis of debility from September 29, 2010 through September 30, 2011.

82.     On September 30, 2011, Patient MW's diagnosis was changed to dementia, and she has continued to receive hospice care.

83.     When Patient MW's diagnosis was changed to dementia, she had scored a Functional Assessment Staging Test ("FAST") level of 6D, making her ineligible to receive hospice care for dementia.

84.     A diagnosis of dementia also requires one of six particular medical conditions or a rapid decline in health, but Patient MW did not have documentation supporting any of these findings, further making her ineligible for hospice care for dementia.

85.     Patient EE has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since June 23, 2011.

86.     Patient RF has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since May 16, 2011.

87.     Guardian submitted a claim to Medicare Part A for $5,635.04 for hospice care given to Patient RF (Patient No. GCO464955) from December 1, 2011 through December 31, 2011.

88.     Patient LF has received hospice care from Guardian, billed to Medicare, for a diagnosis of debility since October 4, 2011.

89.     Patient ND has received hospice care from Guardian, billed to Medicare, for a diagnosis of AFTT from April 22, 2010 through November 18, 2011.

90.     During her time receiving hospice care for AFTT, Patient ND's weight stayed consistent and her midarm circumference (rapid decline of which supports eligibility for hospice care) actually *increased*. Her health did not decline during this time.

91.     On November 18, 2011, Patient ND's diagnosis was changed to End Stage Cardiac Disease ("ESCD") and she continued to receive hospice care from Guardian, billed to Medicare.

92.     Because Patient ND had been in hospice care since April 2010 with a diagnosis of debility, however, she never received treatment or therapy for ESCD, a prerequisite for receiving hospice care for this diagnosis.

93.     Patient ND had not complained of any chest pains or shown any signs of ESCD.

94.     *After* Patient ND was diagnosed with ESCD, Dr. Agbeyegbe put her on nitrates in order to make the diagnosis more convincing.

95.     Patient BN was admitted by Guardian on July 13, 2010 with a diagnosis of debility.

21

96.     Upon her admission Guardian prepared supporting documentation for Patient BN's prognosis of debility that gave her a PPS score of 40% and found that she was dependent on assistance with bathing, dressing, and feeding.

97.     The nurses who actually treated Patient BN, including Relator Williams, documented that she was not as sick as the admission or recertification documents stated, even over a year later. During Patient BN's first year, nurses documented no decline in her health. Her PPS score generally remained at 40%, and nurses documented that she required no assistance with transfers, feeding, or continence, and minimal or no assistance needed with dressing and bathing. Nurses also documented that she was not in any pain, was fully alert and verbally responsive, and had no respiratory or cardiac problems.

98.     Notwithstanding these notes by the treating nurses, members of Guardian management who never treated Patient BN fabricated supporting documentation to keep her eligible for hospice care and continually recertified her.

99.     Fourteen months after Patient BN's admittance, nurses were still documenting physical and mental stability and conditions that made her ineligible for hospice care.

22

100.   Notwithstanding that she had never shown signs of cardiac issues, on July 8, 2011, Patient BN's diagnosis was changed from debility to end stage cardiac disease.

101.   As FAST score is not a component of eligibility for end stage cardiac disease, on August 19, 2011 Patient BN's FAST score was upgraded to 6D. In other words, if Guardian's management's notes were to be believed, Patient BN's mental state actually *improved* during her first year of hospice, specifically immediately after her diagnosis was changed.

102.   On September 6, 2011, at a Guardian IDT meeting, the employees in attendance agreed that Patient BN did not meet the criteria for hospice care eligibility.

103.   Rather than discharge Patient BN, Guardian (specifically William Maddox) recertified Patient BN for another sixty days.

104.   Guardian billed Medicare for sixteen months of hospice care for Patient BN before she was discharged.

*Cancer*

105.   Another example, in order for cancer patients to be admitted to hospice care, they must have cancer with metastasis, and there must be radiologic reports to substantiate this diagnosis.

23

106.   Jewelene Griffin has often stated that if a patient does not meet the requirements for hospice care, but if that patient has a history of cancer, she will tell the medical director that the patient has cancer in order to get them admitted.

107.   Patient BN2 was admitted to Guardian's Georgia hospice on July 22, 2011 with a diagnosis of end stage renal disease. Cindy Norton instructed the admitting nurse, Theresa Foster, to admit Patient BN2 even though Foster did not have labwork or documentation to support the diagnosis.

108.   In fact, Norton did have the labwork for Patient BN2, but lied to Foster about it because the labwork indicated that Patient BN2 was not eligible for hospice care.

109.   To be eligible for hospice care with a diagnosis of end stage renal disease, a patient must either have a creatinine clearance of less than 10cc/min, or serum creatinine level greater than 8.0 mg/dl.

110.   According to Patient BN2's labwork from July 7, 2011, her serum creatinine clearance was 11.72 cc/min, and her serum creatinine level was 2.38 mg/dl.

111.   Because Norton knew that Patient BN2 did would not be recertified when her creatinine levels were next tested, after Patient BN2 was admitted, Norton changed Patient BN2's diagnosis to dementia (which requires diagnosis by a subjective test rather than labwork) without a doctor's order.

112.   Patient BN2 was not eligible for hospice care for dementia either, as her nurses graded her with a FAST score of 6D, and so she did not did not have the Grade 7 score necessary to be eligible for hospice care.

113.   Norton did not tell the other DCOS, Felichia Paulk, that she had changed Patient BN2's diagnosis, resulting in the different DCOS's working with completely different diagnoses for the same patient.

114.   Guardian fraudulently billed Patient BN2's hospice care to Medicare (policy number 3971010120) for her entire treatment by Guardian.

115.   Patient MH2 was admitted to Guardian on April 5, 2010 with a diagnosis of prostate cancer with metastasis. Although Patient MH2 had a history of prostate cancer, he did not have any radiological reports to support a diagnosis of prostate cancer at the time of admittance.

116.   Patient MH2 was not referred to hospice care by a physician. Patient MH2's wife called and requested hospice care, and so Guardian fabricated a diagnosis that made him eligible for hospice care.

117.   Patient MH2 was in remission during his entire period of receiving hospice care and there was never any documentation to support a diagnosis of prostate cancer with metastasis.

118.    Patient MH2 was recertified and received hospice care for over a year even though Guardian never had any radiological reports to support a diagnosis of prostate cancer with metastasis.

119.    Guardian billed Medicare for Patient MH2's hospice care through at least May 29, 2011.

120.    On September 14, 2010, Patient PL was referred to Guardian by his attending physician with a diagnosis of "chronic dementia, and altered mental status".

121.    That same day, on September 14, 2010, Patient PL was admitted to Guardian hospice care with a diagnosis of End Stage Prostate Cancer.

122.    There is no mention of prostate cancer in Guardian's documentation of Patient PL's medical history, nor a tissue diagnosis of malignancy, which is required for a diagnosis of end stage cancer.

123.    Notwithstanding a complete lack of documentation supporting a diagnosis of End Stage Prostate Cancer, Guardian provided hospice care to Patient PL under this diagnosis, which it billed to Medicare, through at least October 7, 2011.

**Fiscal Intermediaries' Additional Document Requests**

124.   On January 12, 2012, fiscal intermediary Palmetto GBA submitted to Guardian's Georgia hospice seventeen requests for additional documents ("ADR") for certain non-cancer hospice patients.

125.   All five of Guardian's hospices received ADRs from their fiscal intermediaries.

126.   Each of these ADRs was for documentation supporting the eligibility of each of the patients' Medicare reimbursement claims.

127.   Relator Williams was assigned to the team at the Georgia hospice that was to resolve the ADRs.

128.   On or about January 31, 2012, Wilma Falcon, a Hospice Clinical Specialist for Guardian/AccentCare, arrived at the Georgia hospice to assist with the ADRs.

129.   On January 31, 2012, Falcon told Relator Williams that the lack of documentation at Guardian's Austin, Texas hospice was even worse than the Georgia hospice. Falcon repeated this to Relator Williams on February 1, 2012.

130.   Falcon's examination of the files for the patients covered by the ADRs in late January revealed that the problems at Guardian were systemic.

131. A spreadsheet created by Falcon indicated that of 17 patients' files reviewed from the Georgia hospice, 14 lacked the requisite signed Election of Benefits form, 8 did not have the necessary documentation for admission or recertification, 10 had narratives from the physician that failed to adequately support the admission or recertification, and 11 lacked documentation showing that the physician or nurse practitioner had conducted a face-to-face evaluation of the patient prior to admission or recertification.

132. A spreadsheet created by Falcon indicated that of 19 patients' files reviewed from the Austin, Texas hospice, 17 lacked the requisite signed Election of Benefits form, 8 did not have the necessary documentation for admission or recertification, 8 had narratives from the physician that failed to adequately support the admission or recertification, and 8 lacked documentation showing that the physician or nurse practitioner had conducted a face-to-face evaluation of the patient prior to admission or recertification.

133. A spreadsheet created by Falcon indicated that of 6 patients' files reviewed from the Beaumont, Texas hospice, 5 lacked the requisite signed Election of Benefits form, 5 did not have the necessary documentation for admission or recertification, 3 had narratives from the physician that failed to adequately support the admission or recertification, and 5 lacked documentation showing

that the physician or nurse practitioner had conducted a face-to-face evaluation of the patient prior to admission or recertification.

134.   A spreadsheet created by Falcon indicated that of 4 patients' files reviewed from the Franklin, Tennessee hospice, 3 lacked the requisite signed Election of Benefits form, 3 did not have the necessary documentation for admission or recertification, 3 had narratives from the physician that failed to adequately support the admission or recertification, and all 4 lacked documentation showing that the physician or nurse practitioner had conducted a face-to-face evaluation of the patient prior to admission or recertification.

135.   A spreadsheet created by Falcon indicated that of 17 patients' files reviewed from the Waco, Texas hospice, 14 lacked the requisite signed Election of Benefits form, all 17 did not have the necessary documentation for admission or recertification, 15 had narratives from the physician that failed to adequately support the admission or recertification, and all 17 lacked documentation showing that the physician or nurse practitioner had conducted a face-to-face evaluation of the patient prior to admission or recertification.

136.   Guardian requested that the physicians re-write their prior recertification statements to provide better support for their recertification decisions.

137.   Guardian also demanded that the nurses fabricate supporting documentation and backdate it to support the billing periods in question.

138.   All of these ADRs were for claims that Guardian had submitted to Medicare.

139.   For example, Guardian submitted a claim to Medicare Part A for $6,645.04 for hospice care given to Patient KG from December 1, 2011 through December 31, 2011.

140.   Guardian submitted a claim to Medicare Part A for $6,495.04 for hospice care given to Patient KE from December 1, 2011 through December 31, 2011.

141.   Guardian submitted a claim to Medicare Part A for $6,875.04 for hospice care given to Patient FL from December 1, 2011 through December 31, 2011.

142.   Guardian submitted a claim to Medicare Part A for $8,125.04 for hospice care given to Patient BM (Patient No. GHA541672) from December 1, 2011 through December 31, 2011.

143.   Patient BM had been admitted by Guardian on June 11, 2010 with a diagnosis of debility.

144.   On January 22, 2012, Falcon sent an email to Taylor and Griffin stating that the first two days of Patient BM's review period were under a Parkinson's diagnosis, but Patient BM did not show eligibility or decline under Parkinson's.

30

The remainder of the month Patient BM was reviewed for dementia, but the FAST scores did not support a diagnosis of dementia.

145.   Guardian submitted a claim to Medicare Part A for $6,825.04 for hospice care given to Patient LM for dementia from December 1, 2011 through December 31, 2011.

146.   When Patient LM was admitted on May 12, 2010 with a diagnosis of dementia, she scored 7A on the FAST test.

147.   On December 5, 2011, **after almost nineteen months of receiving Medicare-funded hospice benefits,** and still with a diagnosis of dementia, Patient LM **still** scored a 7A on the FAST test.

148.   On January 12, 2012, Guardian submitted a claim to Medicare Part A for $7,016.23 for hospice care given to Patient CA from December 1, 2011 through December 31, 2011.

149.   On January 22, 2012, Falcon sent an email to Taylor and Griffin stating that the nurse practitioner's notes from December 6, 2011 for Patient CA, who was admitted with dementia, stated "no changes since last (F2F) visit", that neither the nurse practitioner nor hospice physician had attested to the face to face encounter on the recertification form, and requesting "additional supporting

information for decline since **there is never a change in the PPS, MAC, and FAST**" (emphasis added).

150.   Guardian submitted a claim to Medicare Part A for $7,685.04 for hospice care given to Patient VN from December 1, 2011 through December 31, 2011.

151.   Guardian submitted a claim to Medicare Part A for $7,305.04 for hospice care given to Patient AC from December 1, 2011 through December 31, 2011.

152.   Guardian submitted a claim to Medicare Part A for $6,355.04 for hospice care given to Patient RC from December 1, 2011 through December 31, 2011.

153.   Guardian submitted a claim to Medicare Part A for $7,755.04 for hospice care given to Patient LH (Patient Control No. GRO517771), admitted for AFTT, from December 1, 2011 through December 31, 2011.

154.   Guardian lacked nurses' documentation supporting recertification for Patient LH for December 2011. In fact, nurses regularly gave Patient LH a score of 50% on the PPS, when a PPS of or less than 40% is required to support certification for hospice care for AFTT.

155.   Guardian submitted a claim to Medicare Part A for $5,655.04 for hospice care given to Patient EB (Patient Control No. GHA585772) from December 1, 2011 through December 31, 2011.

156.   On January 22, 2012, Falcon sent an email to Taylor and Griffin stating that the physician narrative and nurse practitioner's visit notes did not adequately support the October 8, 2011 recertification for Patient EB, and that the nurses' notes did not show a decline making the patient eligible for the December 7, 2011 recertification.

157.   For example, the February 12, 2011 IDT Summary for Patient EB, who was admitted for dementia, stated that her PPS was at 20% and her FAST score was 7F. The October 7, 2011 IDT Summary for Patient EB indicated that her PPS was still 20%, her FAST score was still 7F, and her mid-arm circumference remained steady at 32 centimeters. In other words, her condition stayed the same throughout those eight months that she was receiving hospice care, but Guardian continued to recertify her and bill Medicare for her care.

158.   On January 12, 2012, Guardian submitted a claim to Medicare Part A for $6,965.04 for hospice care given to Patient DP (Patient Control No. GHA663734) from December 1, 2011 through December 31, 2011.

159.   On January 22, 2012, Falcon sent an email to Taylor and Griffin stating that "the documentation by the physician, NP, and nurse are not showing eligibility" for Patient DP for December 2011 and to "obtain additional supportive documentation".

160.    On January 12, 2012, Guardian submitted a claim to Medicare Part A for $5,655.04 for hospice care given to Patient EP (Patient Control No. GRO465391) from December 1, 2011 through December 31, 2011.

161.    On January 22, 2012, Falcon sent an email to Taylor and Griffin regarding Patient EP stating that the nurse practitioners require training since "**Eligibility and decline documentation is inconsistent with what the physician writes and what the nurses write**" (emphasis added).

162.    On January 12, 2012, Guardian submitted a claim to Medicare Part A for $5,495.04 for hospice care given to Patient JH (Patient Control No. GRO380605) from December 1, 2011 through December 31, 2011.

163.    Patient JH lacked the necessary physical criteria to qualify for Medicare reimbursement of hospice care. For example, Patient JH began to receive hospice care, billed to Medicare, for a diagnosis of dementia on June 3, 2010. On December 6, 2011, after more than eighteen months of hospice care, Patient JH's serum albumin level was 4.4 gm/dl. A serum albumin level of less than 2.5 gm/dl qualifies a patient for hospice care for dementia.

164.    On January 12, 2012, Guardian submitted a claim to Medicare Part A for $7,685.04 for hospice care given to Patient BN (Patient Control No. GSN641531) for a diagnosis of dementia from December 1, 2011 through December 31, 2011.

34

165.   On January 22, 2012, Falcon emailed Taylor and Griffin that the nurse practitioner did not even examine Patient BN for dementia during the face to face visit, and that the physician narrative did not match the nurse's supporting documentation.

166.   On January 12, 2012, Guardian submitted a claim to Medicare Part A for $6,935.04 for hospice care given to Patient DK (Patient Control No. GHA639401) for a diagnosis of AFTT from December 1, 2011 through December 31, 2011.

167.   On January 22, 2012, Falcon emailed Taylor and Griffin that the documentation for Patient DK's admission in April 2011 was similar to the documentation in December 2011, that the measurable data had not changed, and the documentation did not show decline.

168.   Upon information and belief, Guardian is in the process of fabricating supporting documentation and backdating fabricated nurses' notes to support the eligibility of the patients in question.

**Internal Audit**

169.   Relator Williams called Guardian Hospice corporate compliance on October 28, 2011 and complained that Guardian was committing fraud.

170.   As a result of Relator Williams's call, Guardian/AccentCare sent an independent auditor and Medicare specialist, Toni Mayes, to audit Guardian's patient records and Medicare billing.

171.   Mayes discovered that a large number of Guardian's current patients were not eligible for Medicare reimbursement for hospice care and began recommending that patients be "live discharged", meaning that hospice services cease immediately.

172.   Before Mayes arrived, Guardian's Georgia hospice had a policy to never live discharge a patient and to always provide hospice care services to ineligible patients at least until the end of their terms.

173.   At the Georgia Hospice, Mayes audited the records of twenty-one patients who had been receiving hospice care for more than 360 days, and an additional fifteen patients who had been receiving hospice care for more than 180 days.

174.   Mayes's audit found most of the patients whose files she audited should not have been receiving hospice care and should have been discharged prior, for the same reasons as stated herein.

175.   Mayes was at the Georgia Hospice for approximately two weeks, and Guardian stopped the live discharges as soon as she left.

176.   Mayes told Relators that she was going to all of Guardian's hospices, as they were all dealing with the same matters of fraud that the Georgia hospice was.

**Other Fraudulent Practices**

177.   On at least one occasion, Cindy Norton instructed case manager Paige Watt to change the revocation date (i.e., the date that a patient ceases to receive hospice care) so that Guardian could bill for the entire day.

178.   Watt declined to change the revocation date because doing so would have been fraudulent and unethical.

179.   In September 2010, Guardian case manager Cora Cascone discharged six hospice care patients who she did not believe were eligible for hospice care pursuant to Medicare guidelines, as these patients were enrolled in hospice care when they were not terminal and/or the patients were not showing declining health.

180.   Because Cascone discharged these patients, Guardian gave Cascone the option of being fired or resigning, which she did.

**Retaliation**

181. Throughout their employment, Relators Williams and Betts regularly alerted Guardian management at the Georgia hospice that admitting and recertifying ineligible patients was fraudulent.

182. On November 15, 2011, Relators sent an email to Judi Labossiere (Vice President of Operations and Sales for Guardian Home Care/AccentCare, Inc.) and Claudine Taylor (Executive Director for Guardian's Georgia hospice) stating "This email is to inform you of our intent to report Guardian hospice to the Federal Government for the misuse of Medicaid/Medicare funds." Labossiere confirmed receipt of this email on November 16, 2011. Marsha Lambert, Chief Compliance Officer for Guardian Home Care/AccentCare, Inc., also confirmed that she had seen this email on November 16, 2011.

183. When Toni Mayes came to audit Guardian's Georgia hospice, on or about November 21, 2011 she informed the staff that it was inappropriate to recertify patients who were not in decline, simply to watch them.

184. On December 30, 2011, Relator Betts refused to recertify Patient EE because she had been receiving hospice care with a diagnosis of debility since June 23, 2011.

185.   Felichia Paulk insisted on keeping Patient EE on hospice care "to watch her."

186.   Relator Betts objected that "watching" a patient was not appropriate for hospice where a patient has no documentation of decline.

187.   Also on December 30, 2011, Relator Betts also refused to recertify Patients LM, DS, RB, and DK because none of them were showing decline. In fact, Patient RB had just been discharged from another hospice because he had shown stabilization of health.

188.   Relator Betts stated that recertifying any of these patients would constitute fraud.

189.   On January 3, 2012, the next business day, Paulk terminated Relator Betts's employment.

190.   Because Relator Williams also would have refused to commit fraud, and knew that she would be fired like Relator Betts if she did, she transferred into a position at Guardian that would not require her to recertify patients.

191.   This new position resulted in fewer hours and less pay for Relator Williams.

## COUNT I

### Violation of 31 U.S.C. § 3729 – False Claims Act

192.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

193.   As set forth above, Defendants, by and through their agents, officers and employees, knowingly presented, or caused to be presented to the United States Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

194.   As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

195.   As set forth above, Defendants, by and through their agents, officers and employees, conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B), in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

196.   Due to Defendants' conduct, the Government has suffered substantial monetary damages.

197.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, an amount that will be proven at trial.

198.   The United States is entitled to a civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims.

199.   Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violation of 31 U.S.C. § 3730 – Retaliation Against Relators

200.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

201.   Defendants violated Relators' rights pursuant to 31 U.S.C. § 3730(h) by retaliating against them for lawful acts done by them in furtherance of efforts to stop one or more violations alleged in this action.

202.   As a result of Defendants' actions, Relators have suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Relators Rose Betts and Jennifer Williams pray for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims;

(c) awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relators special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(e) awarding Relators their litigation costs and reasonable attorney's fees; and

(f) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698

**BOTHWELL**
**BRACKER**
ATTORNEYS AT LAW

304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442